247 So.2d 572

**Eugene FONTENOT and Cecilia Fontenot**

**v.**

**MARQUETTE CASUALTY CO., et al.**

**No. 50716.**

May 4, 1971.

Porteous, Toledano, Hainkel & Johnson, William A. Porteous, III, New Orleans, for third party defendant and appellant.

Drury, Lozes & Curry, Felicien P. Lozes, New Orleans, for defendants, third party plaintiffs and appellees.

Porteous, Toledano, Hainkel & Johnson, William A. Porteous, New Orleans, Larry P. Boudreaux, Donald J. Greene, Geoffry D. C. Best, LeBoeuf, Lamb, Leiby & MacRae, New York City, Ronald A. Jacks, Charles W. Havens, III, Washington, D. C., for amicus curiae.

BARHAM, Justice.

The issue for determination is whether the rights of a third person damaged by a party who is insured may be exercised in a direct action for his damages against the reinsurer of the tort feasor's insolvent liability insurer. Contrary to the Court of Appeal, we hold that the treaty or contract of reinsurance here and the law do not permit a direct action by such third person against the reinsurer.

This litigation began as an action for personal injuries arising out of an automobile accident, filed in 1964 by Eugene Fontenot and his wife. Mrs. Fontenot was a

guest passenger in an automobile driven by Lee Holloway, as was his wife, when Willie Louque negligently operated his vehicle and collided with the Holloway car. The following were made defendants in the original action: (1) Louque, (2) Marquette Casualty Company, the liability insurer of Louque, (3) Holloway, (4) Traders and General Insurance Company, Holloway's liability insurer, and (5) Veron Provisions Company, Inc., employer of Louque, which was sought to be held vicariously liable for Louque's negligence. Holloway and his insurer Traders answered the original petition denying negligence by Holloway and asserting negligence of Louque as the cause of the accident. The Holloways as intervening plaintiffs also filed claim against Louque, his insurer Marquette, and his employer Veron for personal injuries.

On February 1, 1965, Marquette was judicially placed in rehabilitation (it has since gone into liquidation), all further proceedings against it were ordered stayed, and a preliminary writ of injunction was issued against it. On the basis of this order and injunction which had been issued out of the Nineteenth Judicial District Court, the trial court stayed all further proceedings against Marquette in this suit.

Answers were then filed by Louque, Marquette, and Veron to the Fontenots' original petition, and third party petitions were filed by them against Holloway's insurer Traders. Veron filed a third party petition against its employee Louque and Marquette for indemnity and contribution. The Holloways filed a supplemental third party petition against American Employers Insurance Company, the insurer of Veron; and the Fontenots by supplemental petition made American Employers a defendant. These petitions were answered by Veron and American Employers.

The Holloways, having ascertained through interrogatories that Peerless Insurance Company was Marquette's reinsurer, made Peerless a third party defendant in June, 1965, alleging that the reinsurance contract brought Peerless within the provisions of R.S. 22:943. Subsequently Veron, but not American Employers, filed a supplemental third party petition also naming Peerless Insurance Company as the reinsurer, claiming that Veron was a third party beneficiary of the reinsurance contract, and seeking indemnification from Peerless for any judgment against Veron in favor of the Fontenots and the Holloways. Peerless answered all of the petitions, denying any liability and urging that R.S. 22:943 did not apply to it under its reinsurance treaty with Marquette and that application of this statute would result in an unconstitutional impairment of the obligation of contracts.

Before the case came on for trial, the Fontenots and the Holloways compromised their claims upon the payment by American Employers of $7500.00 to the Fontenots and $30,000.00 to the Holloways. In the "receipt

and assignment agreement" the Fontenots and the Holloways agreed to " * * * release and forever discharge the said American Employers' Insurance Company, Veron Provision Company, Inc. and/or Willie J. Louque from all claims and demands whatsoever, arising from or in connection with any injuries or damages incurred by them, and they do hereby also bargain, sell, assign, transfer and set over unto the said American Employers' Insurance Company and/or Veron Provision Company, Inc. and/or Willie J. Louque, all of their rights of action which they may have in the premises against Peerless Insurance Company, reinsurer of Marquette Casualty Company and/or Marquette Casualty Company in Receivership * * * ".

As the case then stood, the parties to the action were Veron against Peerless on its third party claim and the Holloways against Peerless on their intervention and third party demand which had been "assigned" to Veron, American Employers, and Louque. Neither Louque, American Employers,[1] Traders, nor the Fontenots asserted any claim against Peerless in these proceedings. A stipulation was reached by the parties remaining in litigation in which it was noted among other things that the Fontenots and the Holloways had been paid by American Employers and assignments made by them of all their claims.

Trial was had on the merits on the stipulation, depositions, policies, and other instruments which were submitted to the trial court, and that court rendered judgment holding Louque at fault and liable for the full compromise settlement to Veron and American Employers. The trial court dismissed the demands of all three parties plaintiff against Peerless. American Employers and Veron appealed (although there was no pleading upon which American Employers could appeal) to the Fourth Circuit Court of Appeal, which reversed the trial court's judgment as to Peerless and granted judgment in favor of Veron and American Employers[2] in the amount of $27,500.00. That court expressed doubt as to the Fontenot assignment and doubt that any claim for indemnification remained. Nevertheless it made its award for the full compromise amount of $37,500.00 less the $10,000.00 limit as to any reinsurance payment, or a total of $27,500.00. See 235 So.2d 631.

Certiorari was granted on the application of Peerless, 239 So.2d 344. The relator Peerless raises interesting exceptions of no right of action and no cause of action (no valid assignment and no right to claim in-

1. All parties agree that the Court of Appeal's judgment in favor of American Employers was erroneously granted since it had not filed a claim against Peerless and was no longer a party in litigation.

2. See Footnote 1.

demnification), as well as lack of indispensible parties (the other two "assignees" and the receiver or liquidator of Marquette and the Commissioner of Insurance). We pretermit any examination of these exceptions since our holding disposes of the claims against relator in full and in its favor.

■ An understanding of reinsurance—its history, purpose, and function—is essential to a determination of the issue before us. Olson, Reinsurers' Liability to the Insolvent Reinsured, 41 Notre Dame Law. 13 (1965); Thompson, Reinsurance (4th ed. 1966), Chapts. 1, 3, 5, 6, 9, 10, and 13; Reinarz, Property and Liability Reinsurance Management (1969), Chapts. 1 and 4; Golding, A History of Reinsurance (2nd ed. 1931); and Hone v. Mutual Safety Insurance Company, 1 Sandf. 137 (N.Y.Super. Ct.1847). Reinsurance is a contract by which one insurance company agrees to indemnify another in whole or in part against loss or liability which the latter has incurred under a separate contract as insurer of a third party. It is neither double insurance nor coinsurance "because regardless of the nature of the liability of the original insurer and the reinsurer, they are not co-liable to the original insured, nor liable to him in the same degree". 19 Couch on Insurance 2d § 80.2. Reinsurance is a method by which an insurance company distributes all or part of its potential losses to another insurance company in order to reduce the extent of its possible loss under any policy or policies it has issued. The insurer, or ceding company, allots to the reinsurer, or assuming company, that possible liability which in its judgment may exceed the amount its financial structure should safely assume on any one risk. Thompson, op. cit. supra at 24. The Court of Appeal correctly said:

"Reinsurance is a standard practice of insurers, small and large. The smaller insurer, with assets not greatly in excess of minimum requirements, cannot financially withstand individually large losses. Even a very large company may consider it imprudent to have too many eggs in one basket, as it were, by remaining alone as the bearer of very large risks. An insurer which might easily carry the individual risks of 1,000 lives insured for $1,000 each might be unable or unwilling to carry the risk of one life insured for $1,000,000; or might carry the fire etc. insurance on 100 $10,000 buildings but be unable or unwilling to carry one $1,000,000 building. It is wholly unlikely that the 1,000 persons would die at once, or the 100 buildings be destroyed at once. But the death of one person insured for $1,000,000, or the destruction of the one $1,000,000 building, could require payment of proceeds equal to the requirements for the 1,000 lives or the 100 buildings.

"An insurer which is offered a risk it does not wish to carry alone may itself spread the risk by obtaining 'reinsurance'

from other insurers, on a suitable basis such as for a percentage share of the risk, or for the excess over the original insurer's retained portion.

"Of course the original insurer which issues a policy remains liable to its insured for the full amount of the insured risks. But as between that insurer and the reinsurers the final loss on the maturity of the risk will fall upon the reinsurers to the extent their contracts stipulate.

"The original insured is usually unaware of the existence of reinsurance, did not bargain for it, and in other jurisdictions is usually said to be a stranger without privity to the contract of reinsurance and with no legal interest in it."

Historically, reinsurance, or "re-assurance", was known to the French in the Seventeenth Century, and came into American law from these French sources. Hone v. Mutual Safety Insurance Company, supra. It was recognized in Louisiana in Egan v. Fireman's Insurance Co., 27 La. Ann. 368 (1875), where the court held it not to be for a third party's benefit. Reinsurance is described in Louisiana's Insurance Code by R.S. 22:941A as an agreement whereby any domestic insurer may "cede all or any part of its risks" to another insurer authorized to accept such risks.

Reinsurance not only affords no privity in contract to the insured, but it is sought by the *insurer* solely for its own protection, profit, and benefit. The amicus curiae brief correctly summarizes from many authorities:

"Some of the more important needs which reinsurance fulfills are: 1) to increase the ceding company's capacity, 2) to help stabilize the ceding company's operating results, 3) to attain a greater spread of risk, 4) to enable the ceding company to withdraw from a given class or line of business within a short period of time, 5) to permit the reduction of the primary carrier's required reserves, 6) to enable a small insurance company to write risks which would normally be beyond the carrier's capacity, and 7) to enable a number of insurers to spread the risk of a catastrophe such as Hurricane Camille over many companies throughout the world. See, generally, Thompson, supra, pp. 9, 24–25; Reinarz, Robert, Property and Liability Reinsurance Management, pp. 14–15. In sum, it allows insurers to meet the public need and also allows the smaller insurer to compete, creating a marketplace.

"While direct liability insurers deal with individual members of the public reinsurers deal with insurers and other reinsurers."

We begin with the premise that ordinarily no one knows of the financial potential of reinsurance except the purchaser (the insurer) and the seller (the reinsurer); that

reinsurance is purchased for the benefit of the insurer, usually a company and its stockholders, and not for the benefit of its individual policyholders or specific contracts of insurance; that it is a contract for indemnity and not liability insurance. From this it follows that " * * * a contract of reinsurance benefits only the original insurer and does not confer any right upon the original insured, the reinsurer ordinarily not being liable to him, either as surety or otherwise * * * ". 19 Couch, op. cit. supra, § 80.66.

The general, even constant and uniform, principle of law in this country is that the original insured cannot enforce his insurer's contract for reinsurance against the reinsurer because the original insured is not a party to or in privity to that contract of reinsurance. 13 Appleman, Insurance Law and Practice, § 7694; 46 C.J.S. Insurance § 1232; 44 Am.Jur.2d, Insurance, § 1867; 19 Couch, op. cit. supra, § 80.66; 41 Notre Dame Law. 13. The only exceptions are made (1) when the reinsurer by his actions and relations with the original insured directly assumes the insurer's responsibility and liability, (2) when the reinsured and the reinsurer merge, and (3) when the contract of reinsurance expressly and spe-

cifically provides for direct liability to the original insured (and this last is not really a contract of reinsurance but is a type of coinsurance).

Louisiana has enacted specific legislation providing for reinsurance, and the provisions pertinent to this case are contained in R.S. 22:941 and 943. R.S. 22:941A permits an insurer to cede by reinsurance agreement all or any part of its risk to assuming insurers. R.S. 22:941B(2) provides that in order for a ceding insurer to receive credit for reserve [3] on ceded risks to the extent reinsured as an asset or as a deduction from liability, the contract or treaty of reinsurance must contain an "insolvency clause" which makes the liability under *the reinsurance contract payable in the event of the insolvency of the ceding insurer* " * * * *to its liquidator or receiver on the basis of the claim or claims allowed against the insolvent ceding insurer* * * * ". (Emphasis here and hereafter has been supplied.)

The vital distinction between reinsurance and liability insurance is that reinsurance indemnifies the insurer for a *loss* which is actually sustained, whereas liability insurance is protection against the *liability* of an insured. The reinsurance agreement be-

---

3. In Louisiana under R.S. 22:891–903 liability insurers are required to maintain reserves against unearned premiums and against contingent losses, in order to insure the solvency of insurance companies in this state for the benefit of policyholders as well as creditors: The ability to use reinsurance to secure credits against reserves is a prime reason for reinsurance. " * * * The small insurer is thus able to accept larger risks and at the same time assure adequate protection for the payment of losses without having to freeze its assets." 45 Tul.L.Rev. 648, 649.

tween Peerless and Marquette provides under Article III that the actual payment by Marquette " * * * for any *loss* shall be a *condition precedent* to any recovery under this Agreement * * * ". In Fidelity & Deposit Co. of Maryland v. Pink, 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937),[4] the United States Supreme Court, in deciding the issue of whether the contract was insurance against liability or an indemnity contract, held that under a clause such as we have here requiring actual payment as a condition precedent to recovery, even a receiver in liquidation must have made actual payment before liability could attach to the reinsurer. Although the question of liability when the insurer is insolvent has been resolved by statute in most jurisdictions, the real significance of the Pink case, which remains as the correct statement of the law, is the holding that a reinsurer's contract for liability conditioned upon payment by the reinsured is an indemnity agreement, a reinsurance contract, and not liability insurance.

Veron here has argued strenuously that its right of action against Peerless arises under R.S. 22:943, contending that this agreement for reinsurance constitutes an assumption by the reinsurer of the policy obligations of the ceding insurer and an obligation to carry out directly the policy provisions including payment directly to Marquette's policyholder.

In Louisiana the exception to the general rule of payment of reinsurance only *to the insurer* is provided in R.S. 22:943: *"Whenever an insurer agrees to assume and carry out directly with the policyholder any of the policy obligations of the ceding insurer under a reinsurance agreement,* any claim existing or action or proceeding pending arising out of such policy by or against the ceding insurer with respect to such obligation may be prosecuted to judgment as if such reinsurance agreement had not been made, or the assuming insurer may be substituted in place of the ceding insurer." This is the negative statement of

4. In 1937, under the standard form of insurance then in existence in New York, the United States Supreme Court held that under a provision in a reinsurance contract that required actual payment by the reinsured prior to the attachment of liability to the reinsurer, the reinsurance company would not have to respond even in insolvency either to the insolvent insurer or any other party for there had been no loss as there was no payment. Fidelity & Deposit Co. of Maryland v. Pink, 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937). The result of allowing the rein-

surer to plead the defense of the insolvency of the insurer to escape its contract with the insurer was abhorrent to the New York Legislature, which passed a statute that is the forerunner of our R.S. 22:941 B(2) and similar provisions in other states. N.Y.Sess.Laws 1939, c. 882, § 77, Insurance Law, McKinney's Consol.Laws, c. 28, § 77. The New York statute was amended in 1952 to require the reinsurance to be payable to the ceding insurer or its liquidator unless there was an actual novation.

the holding in Egan v. Fireman's Insurance Co., supra.

Veron takes out of context certain standard provisions in the reinsurance contract to support this argument. These provisions, however, when read in context are no more than a statement of the contractual relationship between Peerless, the reinsurer, and Marquette, the reinsured. Clauses in reinsurance contracts which fix the liability of the reinsurer to the reinsured as being subject to the original policy stipulations and limits are held by the overwhelming majority of courts to mean that " * * * the reinsured or original policies furnish * * * the basis upon which the contract of indemnity stands, and that in all dealings with the original insured [by insurer] the provisions of the policy issued to him are to be observed * * ". Faneuil Hall Ins. Co. v. Liverpool & London & Globe Ins. Co., 153 Mass. 63, 26 N.E. 244 (1891); Stickel v. Excess Ins. Co. of America, 136 Ohio St. 49, 23 N.E.2d 839 (1939); State ex rel. Menning v. Security General Ins. Co. (In re Security General Ins. Co.) 82 S.D. 47, 140 N.W.2d 676 (1966); 19 Couch, op. cit. supra, § 80.46; 44 Am.Jur.2d, Insurance, § 1862.

Veron relies upon decisions in five jurisdictions as holding that the standard reinsurance provisions, such as are contained in the Peerless-Marquette contract, allow the insured upon insolvency of its insurance carrier to directly sue the reinsurer. It contends that in these jurisdictions provisions similar to those found here have been held to provide indemnity against *liability* (in effect, to be a type of coinsurance) rather than indemnity against *loss*.

In only one jurisdiction in the United States has it been held that provisions which are somewhat similar to those contained in the Peerless-Marquette agreement afford a direct action against the reinsurer upon the insolvency of the reinsured. This holding comes out of Missouri and is founded upon earlier decisions there and elsewhere sounding in equity and not founded on contract interpretation in a court of law. Homan v. Employers Reinsurance Corp., 345 Mo. 650, 136 S.W.2d 289, 127 A.L.R. 163 (1939); First National Bank of Kansas City v. Higgins, 357 S.W. 2d 139 (Mo.Sup.Ct.1962). It may be said that only in Missouri have general provisions in a reinsurance agreement tieing that agreement to policies of insurance been interpreted as an assumption of the liability of the reinsured. The cases from all other jurisdictions cited by Veron have not followed this view, and are distinguishable.[5]

5. *Florida*: In Florida a single case, in which we are unable to determine whether the provisions of the reinsurance contract were similar to those of the one here under consideration, allowed a direct action, relying upon the Missouri cases and other

Moreover, the authorities and the jurisprudence to the contrary are legion. Melco System v. Receivers of Trans-America Ins. Co., 268 Ala. 152, 105 So.2d 43 (1958); Gill v. Blackhawk Mutual Insurance Company, 18 Ill.App.2d 338, 152 N.E. 2d 210 (1958); People ex rel. Hersey v. Cosmopolitan Insurance Company, 89 Ill. App.2d 225, 233 N.E.2d 90 (1967); Crozier v. Lenox Mutual Insurance Association, 252 Iowa 1176, 110 N.W.2d 403 (1961); Winneshiek Mutual Insurance Association v. Roach, 257 Iowa 354, 132 N.W.2d 436 (1965); Appeal of Schunk, 231 Minn. 219, 43 N.W.2d 104 (1950); Moseley v. Liverpool & London Globe Ins. Co., 104 Miss. 326, 61 So. 428 (1913); Sofia Bros. v. General Reinsurance Corp., 153 Misc. 6, 274 N.Y.S. 565 (Sup.Ct.1934); Pink v. American Surety Co. of New York, 283 N.Y. 290, 28 N.E.2d 842 (1940); Squibb-Mathieson International Corp. v. St. Paul Mercury Ins. Co., 44 Misc.2d 835, 254 N.Y.S.2d 586 (Sup.Ct.1964); State ex rel. Manning v. Security General Ins. Co. (In re Security General Ins Co.), 82 S.D. 47, 140 N.W.2d 676 (1966); Commercial Casualty Ins. Co. v. Columbia Cas. Co., 22 Tenn.App. 656, 125 S.W.2d 493 (1938); United States to Use of Colonial Brick Corp. v. Federal Surety Co., 72 F.2d 964 (4th Cir. 1934); Taggart v. Keim, 103 F. 2d 194 (3rd Cir. 1939); Citizens Casualty Co. of New York v. American Glass Co., 166 F.2d 91 (7th Cir. 1948).

■ In Louisiana contracts for the benefit of others, or the stipulation pour autrui,

cases which had been determined in equity or were otherwise distinguishable or inapplicable. Moreover, the dissent in that case calls the majority to account for failure to consider all of the policy provisions. Mitchell v. State ex rel. Williams, 223 So.2d 792 (Fla. 1st Dist. 1969). Contra in Florida and involving language similar to that in our contract, McDonough Const. Corp. v. Pan American Surety Co., 190 So.2d 617 (Fla.App. 1st Dist. 1966). The other cases cited by Veron are not determinative of the issue for which it argues they stand.
*Alabama*: United States Fire Ins. Co. v. Hecht, 231 Ala. 256, 164 So. 65 (1935); although not cited, see the companion case, United States Fire Ins. Co. v. Smith, 231 Ala. 169, 164 So. 70, 103 A.L.R. 1468 (1935). Both cases simply held that the reinsurer "agreed not only to pay the losses, if any, to the *policyholders*, but in the contract the reinsurer obligated itself to 'take charge of and adjust and pay same without expense to' "

the reinsured. But holding directly contrary to Veron's contention in Alabama, see Melco System v. Receivers of Trans-America Ins. Co., 268 Ala. 152, 105 So. 2d 43 (1958).
*New Hampshire*: Hunt v. New Hampshire Fire Underwriters' Ass'n, 68 N.H. 305, 38 A. 145 (1895), held that the action would not lie in law under contract, but in equity.
*Iowa*: Globe Nat. Fire Ins. Co. v. American Bonding & Casualty Co., 205 Iowa 1085, 217 N.W. 268 (1928); although not cited, see the earlier appeal in that same case, 198 Iowa 1072, 195 N.W. 728, 35 A.L.R. 1341 (1923). Both cases follow the general rule "that no action can be maintained by the insured upon a mere reinsurance contract for the reason that it is neither a party thereto nor in privity therewith." Recovery was allowed in equity and on a finding that there was special agreement between the insured and the insurer that reinsurance was for the original insured's benefit.

must be in writing and clearly express that intent. La.Civ.Code Arts. 1890, 1902. An examination of the reinsurance agreement here discloses no intention that the reinsurance contract stipulated anything in favor of the insureds of Marquette. Clearly the reinsurance contract was entered into for the benefit of Marquette or, upon its insolvency, for the benefit of the liquidator and ultimately and indirectly for the benefit of all the creditors of Marquette.

The Court of Appeal in the instant case erred in construing the reinsurance treaty contrary to the unequivocal intentions of the parties as well as to the statutory law of this state. See 45 Tul.L.Rev. 648. That court looked to the direct action statute, R.S. 22:655, which provides that the insolvency of the insured shall not release the insurer from payment of damages under a contract of *liability* insurance, and provides a right of direct action against the insurer for damages under a *liability insurance policy*. It was stated by the Court of Appeal: "The original insured is not a party to the reinsurance contract and cannot sue on that contract unless he is a third party beneficiary for whose benefit it stipulates some advantage, LSA–C.C. art. 1890 (or unless some provision of law gives him the right to sue, like the direct action statute does for tort victims only)." The Court of Appeal appeared to recognize that the agreement under consideration would hold the reinsurer liable during solvency "only against the *losses* of the insurer on account of such liability" for actual payment of damages to the injured. However, in considering the meaning and effect of the "insolvency clause" of the contract of reinsurance, that court transformed an indemnity agreement into a liability insurance policy, relying upon the first sentence of the insolvency provision of the contract: "In the event of the insolvency of the Company, reinsurance hereunder shall be payable by the Reinsurer *on the basis of the liability of the Company under the contract or contracts reinsured without diminution because of the insolvency of the Company.*" That court held that when the insolvency clause becomes operative, "the contract is one of liability insurance, to protect the insurer against liability", and that under the direct action statute the third party was entitled to recover from Marquette's reinsurer.

The proper resolution of whether this treaty for reinsurance is a contract of indemnity or of liability insurance, and whether third parties not in privity to the contract have a direct right of action against the reinsurer, should be made after a reading of the contract or treaty to ascertain the intent of the parties and after an examination of the stipulations in the contract in light of the statutes applying to reinsurance. As previously noted, R.S. 22:941B(2) requires the inclusion of an insolvency clause in the contract making

the reinsurance payable in the event of insolvency on the basis of the liability of the insurer, and precluding a plea by the reinsurer based upon the defense of insolvency of the reinsured. The "insolvency clause" in this contract, when construed in light of this statutory authority, clearly provides that in the case of insolvency the reinsured's liability on the basis of the claims under its treaty shall be discharged by the reinsurer through payment to the liquidator or receiver of the reinsured. The court below omitted the remainder of the insolvency provision in the contract which tracks the language of R.S. 22:941 B(2): " * * * It is agreed, however, that [in the event of insolvency] the *liquidator or receiver* or statutory successor of the insolvent Company *shall give written notice to the Reinsurer of the pendency*

of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim is filed in the insolvency proceeding and that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor. *The expense thus incurred by the Reinsurer shall be chargeable,* subject to court approval, *against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer."* Compare the entire provision in the agreement with R.S. 22:941B(2).[6]

6. R.S. 22:941, subd. B(2) reads: "No credit shall be allowed to any ceding insurer for reinsurance, as an asset or as a deduction from liability, unless the reinsurance shall be payable, in the event of insolvency of the ceding insurer, to its liquidator or receiver on the basis of the claim or claims allowed against the insolvent ceding insurer by any court of competent jurisdiction or any justice or judge thereof, or by any receiver or liquidator having authority to determine and allow such claims. Such reinsurance agreement may provide that the *liquidator or receiver* of any insolvent ceding insurer *shall give written notice of the pendency of a claim* against the insolvent ceding insurer on the policy or bond reinsured within a reasonable time after such claim is filed in the insolvency proceeding and that during the pendency of such claim any assuming insurer may investi-

gate such claim and interpose, at its own expense, in the proceedings where such claim is to be adjudicated any defense or defenses which it may deem available to the ceding company or its liquidator or receiver. The expense thus incurred by the assuming insurer *shall be chargeable against the insolvent ceding insurer as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the ceding insurer solely as a result of the defense undertaken by the assuming insurer."*
Note that in the contract and the statute a saving on a claim inures to the insolvent reinsured, and that thus a pro rata share of the expenses in defending the claim or in mitigating the amount due may be charged against the insolvent reinsured.

A reading of the direct action statute will disclose that the Legislature never envisioned under that statute a reinsurance contract or treaty as being liability insurance. Words foreign to the contract of reinsurance appear throughout R.S. 22:655, the direct action statute: "tort-feasor", "injured persons", "omnibus clause", "liability policies". The last paragraph of that statute reads: "It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or *additional insureds under the omnibus clause*, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of *said policy*." (The only policy here to be construed is the reinsurance treaty or contract.)

■ The direct action statute is not applicable to reinsurance policies where neither a novation of the original policy obligation nor a merger of the companies has occurred. When the direct action statute is read alone, it becomes clear that it could not create a direct right of action for a third party under a reinsurance contract.

This is even more certain when the statute is read in context with a statute of equal grade, R.S. 22:943. That latter statute, which creates the ony exception allowing a third party to sue a reinsurer directly, conditions that exception upon the express requirement that a reinsurer agree " * * * to assume and carry out directly with the policyholder any of the policy obligations of the ceding insurer * * *". Although, as we have previously discussed, Veron argues that these policy provisions create an assumption of the obligations of the reinsured, we find the agreement read as a whole to be a contract for reinsurance only.

■ As was said in Fidelity & Deposit Co. of Maryland v. Pink, supra, " * * * the liability under any written contract must be determined upon consideration of the words employed, read in the light of attending circumstances." Courts should not and cannot by implication extend or restrict a contract to mean something different from that intended by the parties. Nor may the court construe contracts contrary to the intent of the parties to effectuate a determination of what it believes to be in the public interest when the contractual intent of the parties is permitted by law.[7]

---

7. La.Civ.Code Art. 1901: "Agreements legally entered into have the effect of laws on those who have formed them. * * *"

Art. 1963: "When *the intent of the parties is evident and lawful, neither equity nor usage can be resorted to,* in order *to enlarge or restrain that intent,*

■ We find no ambiguity in the reinsurance agreement.[8] Here the reinsurance treaty clearly establishes the intent of the parties to contract for reinsurance and in doing so to particularly comply with the statutory requirements in Louisiana in order that the insurer could receive the benefit of reserve credit for reinsurance as an asset or deduction from liability. The provisions of our Insurance Code do not permit a third party to claim a direct benefit from or exercise a direct right of action against a reinsurer unless there has been a special assumption of the original insurance policy obligation. The direct action statute does not extend to or create a direct action under a reinsurance contract.

■ We hold that the treaty for reinsurance is a contract of indemnity between the reinsurer and the reinsured; that the benefits in the insolvency of the reinsured may be claimed by the liquidator or receiver on the basis of the amount of the claims against the reinsured or its liability under its original policy, and that the treaty of reinsurance does not create any right of action in third parties directly against the reinsurer.

For the reasons assigned the claim of Veron Provisions Company, Inc., and the claims of Mr. and Mrs. Lee Holloway against Peerless Insurance Company are dismissed. Any rights of parties in the proceedings which are reserved by the stay order in the lower court are maintained.

---

*nor can any law operate to that effect,* unless it be some prohibition or other provision, which the parties had no right to modify or renounce."

Art. 1964: "Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from one of these sources."

Art. 1967: "The *law*, intended by the rule before referred to, means such legislative provisions as provide for those cases in which the parties have not declared their intention. When the contracting parties have not derogated from such law, its provisions are to be followed. * * *"

8. It was said by the court below (after a finding that the payee under the insolvency clause was not clearly designated) that ambiguities in a reinsurance contract should be read against the reinsurer, and the case of Employers Mut.

Liability Ins. Co. v. Underwriters at Lloyd's, 177 F.2d 249 (7th Cir. 1949), was cited for that principle. It is correct that if there are any ambiguities in the contract of reinsurance, they should be construed against the reinsurer, but they would be construed in favor of the *reinsured* and not in favor of a third party who is not in privity to the contract. The case cited actually stands for this proposition. If there were ambiguities in this treaty as to the amount or proper recipient of payment in case of insolvency, those ambiguities would be resolved so that payment would be made to the liquidator or receiver of the insolvent company *for the amount of the claim and for the benefit of that company's creditors, including all of its policyholders with claims.* The ambiguities could not be resolved in favor of one not a party to the contract in a manner inimical to the interests of the actual party to the contract in whose favor it should be read.

Costs are cast against Veron Provisions Company, Inc.

HAMLIN, J., dissents being of the view that the result reached by the court of appeal is correct.

DIXON, Justice (dissenting).

I respectfully dissent. I agree with the reasoning of the Court of Appeal, 235 So. 2d 631 (La.App. 4th Cir. 1970). The rationale of the majority holding of this court is an attempted distinction between a contract of indemnity on the one hand, and a contract of liability insurance on the other. Yet, a Louisiana statute defines "insurance" as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." Louisiana Revised Statutes 22:5(1). And Webster's Seventh New Collegiate Dictionary (1965) defines insurance as "coverage by a contract whereby one party undertakes to indemnify another against loss by a specified contingency or peril." Thus, it can be seen that "contract of indemnity" and "contract of insurance" are synonymous.

Having concluded that a contract of reinsurance is indeed "insurance," the question remains whether it is a contract of liability insurance so as to fall within the direct action statute, Louisiana Revised Statutes 22:655. The Insurance Code defines liability insurance as "Insurance against the liability of the insured for the death, injury or disability of an employee or other person * * *." Louisiana Revised Statutes 22:6(4).

The direct action statute is substantive, not merely procedural. It creates a cause of action as well as a right of action against the insurer. Accordingly, because of the existence of the direct action statute, Marquette is directly and primarily liable for personal injuries caused by the negligence of its policyholders. When Marquette purchases a contract of indemnity to protect itself against its liability for the injury of other persons caused by its policyholders, it is obtaining "insurance against the liability of the insured for the death, injury or disability of an employee or other person." This contract of indemnity, therefore, is a contract of liability insurance, and in turn confers a direct right of action against the reinsurer pursuant to Louisiana Revised Statutes 22:-655.

Peerless Insurance Company bases it defense upon its own definition of its contract as an "indemnity." But when it agreed with Marquette to pay it up to $300,000 for any accident, with no gross total limit (in fact limited only by the $10,000 deductible provision, for loss from any one accident), it wrote a policy of liability insurance. The definitions in the Louisiana statutes must control, and Peerless' defenses fall.